Good afternoon, you may be seated. This is case number 4-12-1090, People of the State of Illinois v. Ryan Holt. Let's see, Attorney Eisner is here on behalf of the appellant and Attorney Majors is here on behalf of the affilee. Ms. Eisner, you may proceed. Thank you, Your Honor. Good afternoon, Your Honors. For the record again, I'm Emily Eisner, as Counsel for Appellant Ryan Holt, may it please the Court. The first issue I'm starting with today is the denial of the continuance and the denial of the mistrial. What happened was that the sole impeaching officer, Officer Latz, went on a honeymoon. My client needed his rebuttal testimony because the resident, Sam Dickey, at trial, specifically denied telling a different story and because telling different stories at different times went directly to his believability. And looking at materiality and then prejudice to my client, trial counsel's most important proffer from the honeymooning officer regarding the entry into the apartment had been a detailed police report showing that contrary to Dickey's trial testimony, Dickey said, they battered me, which contradicted his testimony at trial that Dickey said, they just came in. Counsel's request for the continuance was not unreasonable. In terms of time, just a few days, a matter of 10 or 11 days at most. In terms of relative fault and diligence... It seems like to me, Counsel, 10 or 11 days is a pretty lengthy delay in a jury trial. Well, no, because in this case, number one, there were options. And 10 or 11 is the most, and Counsel actually asked for a shorter period. 10 or 11 was just to accommodate the judge's schedule. And the schedule could have been accommodated and the schedule should not be the only motivating factor. And there was a weekend in there. And the jury needed to decide this case fairly. So it didn't have to be 10 or 11 days. And it could have been less. And there were options. And the jury needed to decide this case fairly. And it was... What would have been the status of Officer Latt's testimony before the trial began? If the status of Officer Latt's testimony... If he had been available, if Counsel had known that he was available... Unavailable, pardon me. He would never have agreed to set a trial date on a day that he was unavailable. So Counsel believed and was misinformed or was not told. And the state had a continuing duty to provide a free-flowing information to Counsel of his availability and that didn't happen. And that's why... Or was he on a witness list? Yes, he was the top attorney on the witness list. And assurances were received when Counsel found this out. And actually before, on the record, Counsel said that he knew the officer... It appears that he contacted the officer, that he knew about his shift, that he was on third shift. And thought he was going to be there at 2 o'clock in the afternoon. So he ended up being flabbergasted at this without any fault of his own. And the state never disclosed anything differently to Counsel or to the court. So, in view of these circumstances, the judge should not have said, Well, bad luck. And elevated his own travel plans of going to South Carolina on Friday over the importance of fairness to my client. And there was much prejudice to a fair verdict, making this a serious abuse of discretion. So, if a defense attorney wants a witness, but has not subpoenaed the witness, and the state doesn't care one way or the other because maybe they're not going to call Officer Latz, the state has an obligation to check the schedules of defendant's witnesses? It's actually two things. The first one is the protocol. And the protocol was that the City of Normal Police Department would make them available. And that was a representation? Right, and that was right. And that is somewhat of an informal arrangement. That's correct, but that is the arrangement. But the second one is the continuing duty of discovery and the free flow of information. So the state, and being on the top of the state's list of witnesses, and cross-references by ours, it's yes. It is yes. What do you mean, being on the top? Because there weren't that many police officers in this case. And Dickie was the most important witness in the case, and he was the sole eyewitness. So the only other witness was Detective Walters, and he did testify. So it was clear that, and the state was putting Dickie on, so the state knew that if Dickie denied that statement, then Officer Latz was going to be the rebuttal witness to perfect his impeachment. So it would be impossible to believe that the state would not know that and that let the defense and everything be scheduled without ever telling anybody and letting the defense counsel and my client bear the brunt of this, without doing anything, without saying anything, and then fighting it at every step of the way, objecting, making it clear that the state did not want Officer Latz to testify. So you're saying the discovery required the state to advise the defendant about an unsubpoenaed witness' honeymoon plans and therefore his unavailability at trial? I'm saying that for a rebuttal witness, that he is not an ordinary witness. He's a police officer. He's in, the defense does not have that kind of access. The defense does not have home addresses. The defense is not going through the bowels of the police department looking for furlough schedules or honeymoon schedules. The defense does not have that kind of access. Well, then it sounds like to me they better use their subpoena power. The subpoena power, the subpoena power, not only is that necessary for diligence just generally, especially when you have a protocol, but the subpoena would not have done any good. It would not have any good. It wouldn't have changed the honeymoon. It wouldn't have changed the wedding. And the point being is that you have two parties and it's relative fault and reliance. And it's the state that laid low and the state that didn't come forward. And the defense, the defense did what it needed to do because the subpoena, the subpoena wasn't necessary and might not have done anything good either. So when you look at this and when you look... As soon as the trial date is set, if you issued the subpoena, wouldn't there then have been an obligation on the part of the officer to say, well, I'm not available, and then both lawyers would be notified and confer with the court about a trial date? What would have happened would have been that on this record, because of the surprise element, it appears from this record that no one knew about it. They didn't know about it. And the state, if anyone knew about it, it would have been the state. But counsel did not know about it. And counsel is not... Counsel did what he needed to do. I think he did more than he needed to do because it looked like he actually did look into it because he says on the record that he had looked into... that inquiries had been made and then he knew his shift. So I think... I understand because of the element of surprise. If somebody's on the witness list and you want them there, you issue the subpoena, and then I'm assuming the police officer would tell his supervisor, I'm not available on that date. And then maybe there is some... Maybe then there is an obligation to notify somebody who would bring it... I was a trial judge for a long time, and I've had some strange excuses, and not excuses, real problems where you had to reschedule or do things differently. And if there had been a subpoena issued and nobody had done anything about getting that person there and it was a police officer, I would be looking for a way to resolve it. The difference in this case is there seemed to be a pattern here because when there were inquiries made, the counsel was told by a supervisor and by some fellow officers that he was available. So it made it incumbent on the state to come forward and say something differently. And by not doing that at any time, frankly, it's a little bit less above board in this case. Well, it could be really bad communication between the state attorney's office and the police department. Correct. Which can happen without ill motive. Correct. We know that happens in government all the time. Correct. Failure of communication. Correct. And the failed communication should not be visited on my client in a case like this. Turning to the next issue that I'm going to argue today is the plain error of the jury's unanswered request for the definitions of the term solicit and vet. And here the jury during deliberations asked the court to be provided with legal definitions but the court said there were none, which abdicated the court's duty to answer a legal question when, as here, there were available legal definitions. Didn't defendant's counsel agree to the answer the court gave the jury? That's correct. He did. And the duty is the court's and there are several reasons why that is true. Number one is the case law, is the Landwer case and especially the Mark Downs case, which go into this. And that it's the court's duty because the court is the one that's answering the question. And counsel can participate and try to help, but at the end of the day if the court makes an error and in Landwer the trial attorney said, oh your honor that's the exact right thing to do and in Mark Downs the trial attorney said the same thing. But when there is a legal available definition and it needs to be answered. But this is more than just agreeing to it. Your client's trial attorney did not want the jury instructed on the definition of those words. Frankly, he missed the boat. He was dead wrong. He made a statement that it was opening a can of worms on mental states. And that's the exact reason. That was the rationale that was rejected. He misspoke or he was wrong. Those are two different things. He missed the boat. I'm sorry. He missed the boat. He missed the boat.  He was wrong. He affirmatively asks the court not to give the jury a definition. And now you're here arguing to us that the court was wrong for failing to give a definition despite. Correct. Correct. Because it was the court's duty and because it was on mental states. Because mental states goes to the heart of criminal law. Because there were legal definitions. If you invite error in the trial court are you free to argue it in the appellate court? No, if there aren't exceptions to that rule. And in this case when it's jury questions and when it's answers and the answers are available and they're important, then yes, it must be done. And the judge and the state below, the state frankly is a stop from arguing on appeal because they agree with our position that the question should have been given. So it was not strategic. It was a mistake. And the only reason we did not argue in effect of the Citizens Council was because the duty belongs to the court under the cases that we cited. And just to add to that, why maybe that is so important. In some cases that's correct. But cannot argue something on appeal if someone has participated in. But the difference is that's usually strategic and it's not as important as it is here. In here, we've argued plain error under the closely balanced test. The other point that I need to highlight is that the structural integrity of the process was compromised. By enabling a lesser standard of proof to be, excuse me, not proof, but culpability to be applied. That without the definitions of a bet, which mean to incite and bait, and without solicit, which means to persuade, which is different than what a jury might think it just means to get or to ask for, to solicit something. It enables the jury to apply a lesser standard of culpability. Is there an IPI instruction that defines solicit or a bet? No, and that's what makes this case worse because the jury had nothing else to go on. They had no other instruction to go on. So when they asked and there was a jury, there was an answer available, they should have been given. But instead, they're left to fend for themselves. And it enabled them to believe in trying to figure this out, that the mere acts of joining or being present with a group, come what may, whatever's going to happen in that household is enough, when that's not correct. Well, your client was looking through the punches, wasn't he? Well, he had a strong case and the jury should have come back not guilty. So he threw the punches. But there were so many errors in this case that the jury was prejudiced and didn't have the tools necessary to weigh the credibility without Officer Latz, without correct jury instructions, the 11 issues in my brief that I've raised. The reason I said that is because you're worrying about the definitions of solicit and a bet, which in my mind would apply to some of the other people in the group before, but not to your client, who's the guy who's actually throwing the punches. Oh, that kind of punch, I'm sorry. There's two problems with that. Number one is the way the charges and the instructions in the closing argument. The prosecutor was attempting to rope in all the defendants as a principal and accomplice. And then they also, the jury was also concerned with both kinds of actors. So the person who's abetting or being abetted, the person who's soliciting and being solicited. And at the door, which is a separate element, it's not the punch because that's not dispositive or even is not dispositive of home invasion and criminal trespass. So they needed to have those definitions. And if they had, they could have found that the ringleader, alleged ringleader in this case, was not my client, was a parent. And my client was following a parent. He was passive. How does that get him off the hook? So the father's there. Let's say the jury believes the father knocks at the door. Your client goes in right after him. They confront Vicki. They go down in the basement. Your client punches out Shwee or Shizwe or whatever his name is. Because what happened at the door, because there's several different elements here. Number one, the jury had to find whether or not he had an intent. And the intent, whether it was a specific intent, whether it was intent to cause injury, whether the entry was consensual, whether Vicki was telling the truth. And all of those things would negate every one of those crimes. And the only thing that might be left, assuming the denial of fear trial would affect that too, the only thing that would be left would be misdemeanor battery. And that's the only thing left. And that's the only thing that my client would have done under the sufficiency of the evidence if he didn't get a fair trial. So the entry, the intent, the knowledge, all of those things were... Was he charged with aggravated battery or misdemeanor battery? It was misdemeanors. There was no medical, he didn't seek medical attention. So, I mean, it was not, it would have been misdemeanor battery. There was no charge of aggravated battery and that's not a lesser included offense. The last set of issues I'm arguing today highlights that my client did not commit a crime of home invasion or any of the charge offenses when one of the residents acquiesced to the entry. This was not an unauthorized entry. There was a knocking on the door. The resident, Samuel Dickey, him coming down the stairs, agreeing that the visitors openly and truthfully stated their purpose and then escorted them, my client, and towed through the house. And no matter how we look at this, no matter how we look at it, the entry was not unauthorized. No matter what happened later, no matter what happened in the Chibi bedroom or whose hand was on the doorknob, there had been no break-in, there was no coercion, the lights were on, Dickey knew who they were. This was not a ruse. Dickey, whether willingly or reluctantly, did not refuse the visitors with a dad who was fervently looking for his son. It was a family crisis and Caleb was believed missing. Dickey knowing for a while that this was the aftermath of a birthday party, that it had become a brawl, and a family member, Caleb, was missing and beaten. So he knew that and that's what happened at the entry. And what is important here is that the element of unauthorized entry is measured by an objective standard. It's what we look at what the resident conveys and does because it's the resident's reactions at the door that led my client to reasonably believe that he was being allowed inside. But there was contrary evidence that the jury could consider. For example, Dickey testified he did not open the door for them. Whether he opened the door or not, the situation is still the same. Number one is that either the door was locked, in which case he had to have opened the door and he had to as the way the door comes in, he would have allowed them inside. And number two, if the door was unlocked, then he was just standing there. And I guess what I need to stress is this is not an affirmative defense. The defense didn't have to prove that we were invited inside. The defense, the state had to prove that they were trying to keep them out or trying to throw them out. Because this is not a situation where it could be implied because people came to the door with guns or knives and obviously you're too intimidated to say anything. This is a situation where the purpose was being stated, they knew it, and Dickey just let them come through. Thank you, Ms. Eisner. You have more time on rebuttal. Thank you. Mr. Majors. May it please the court, counsel. I brought some water with me because my voice tends to dry up. If I kept track correctly, counsel was concerned with three out of what she said was 11 issues. She might have run out of time, Mr. Majors. We've had it delayed around that first issue for quite a while. I'll confine myself to those three until the court tells me that they're interested in the remaining issues, if that's acceptable. A lot of counsel's comments are tied to the facts. One problem of the plain air is whether the evidence was closely balanced, and counsel said several times, I think, that she thought the evidence was closely balanced. And by my accounting, I tried to keep a chart of the arguments and what was potentially forfeited and what wasn't and when they raised assistance to counsel and when they didn't. But to get to the facts and maybe save everyone some time, our position is it wasn't closely balanced. I think there is an argument about counsel on the... No, it isn't. I'm sorry. There are no arguments about counsel. It's all plain air or just air. Go to page 13 of my brief. And being brief, I talked for about three sentences about Officer Wolters. He interviewed Defendant. Defendant admitted he was there. He admitted he wore a black and white scarf. He admitted the scarf could have covered his face. He admitted he punched Shue. I don't know how to pronounce that man's name either, but I'm pronouncing it as Shue, S-C-H-I-E-W-E. So, what's left? The defense lawyers here, I think, displayed great strategy and great experience, and they attacked where they thought the state was weakest, and that was the entry. And Mr. Holt, anyway, admitted everything but the entry. Well, he came in. So, who did they attack? Dickey. Dickey is the guy coming downstairs, talking to his girlfriend on the phone. They have a description, and they have pictures of the front door, but they're not part of this record, where the windows are on the side. You don't come down the steps and look and see who's outside. You have to go over here or go over there. Dickey says the door just came open. Now, at this point, as the court well knows better than I do, we look at the light most favorable to the state, not to the defense. So, how do they impeach Dickey? Well, they continuously said that he was ashamed that he let him in and he was responsible for a shoe getting punched in the face, and that's why he lied. On the other side, we have a young man that was at a party. He got into a scuffle. Who knows who was at fault? Young men plus alcohol equals chaos and violence. He leaves. He vows to return. He says he's going to come back with a gun and blow everybody away. He goes and complains to his father, works his father into a frenzy. Next thing you know, they're on the front step of this house, and lo and behold, Mr. Holt has a mask on. Now, that reveals his intent. Now, at trial and even on appeal here, they try to call this mask a bandana, a piece of cloth, a handkerchief. I don't mean to offend anybody, but they call it a girly scarf, a woman's scarf, something that a woman wears underneath her clothing. I don't know anything about that. But it's a mask. Once you put it over your face, it's a mask. They avoided that word like the plague at trial, and they avoid that word now, and it's a mask. What was his intent when he entered? Why are you wearing a mask? If you're looking to find this Caleb, why are you wearing a mask? Why do you keep the mask on when you go down and punch you in the face? Because you're committing a criminal act, and you don't want to be identified. Now, on this continuance, all Lats would have said was, supposedly, Dickey, and remember, Dickey's the guy they want to attack. Dickey said that he threw the phone, that Mr. Wissmiller, if I'm pronouncing that correctly, the older man, threw the phone down. Well, Mr. Wissmiller testified and said, I threw the phone down. So what? The other thing he was going to say, supposedly, is that Dickey said I was thrown down. Dickey said, no, I wasn't thrown to the ground. I never said that to Officer Lats. What difference does it make? If you're the defense lawyer, why would you want evidence that says that the man that supposedly let you in was thrown to the ground? It would be just the opposite. This would be potential impeachment, if at all, by an investigating officer, who the state said came later on the crime scene and probably just repeated what other officers said. Now, if you look at the record, defense counsel says, oh, judge, we'll have him here in a couple hours. Oh, no, no, we'll have him here in a day. Oh, no, we'll have him here in two days. Now, I'm looking at 120 years of trial experience by trial lawyers and trial judges and now as appellate justices. You know how they do that. Oh, we're going to get him, judge. No, we didn't subpoena him, but we'll have him here. Well, they didn't do anything. Now, this agreement with the police department is just something that the lawyer said. And we all know it. For as long as I can remember, if you want a witness, you better have a subpoena out. You better have an explanation for the trial judge. Yes, we subpoenaed him and he's not here. Was there agreement with the police department or with the state's attorney's office? I think the record says that the defense lawyer said it was with the police department. But the prosecutor objected. He said, no, no, no, where's your subpoena? So that doesn't comport with their statement that this informal agreement exists. The counsel seemed to imply that the state's attorney's office misled the defense counsel about the availability of this witness. What's your response to that? That the state's attorney did? That's what I took from her. I don't see that in the record. There is some comment about some defense lawyer saying we had an agreement with the police department. Where is that supported anywhere? And even if you're correct, Judge. I didn't say that was my position. I said that's what counsel seemed to imply. I think that's just a lawyer. He says, oh, I don't know whether Mr. Holt's going to testify or not. So he didn't even know yet whether Mr. Holt was going to testify. And then he says, I think I got it verbatim in the record. Then he says, oh, well, I want this guy. And then the judge says, well, have you got to speed it? No. No, no. Where is he? I don't know. I'll have him here in an hour. I'll have him here in two days. Then they find out he's on a honeymoon. Typical defense tactic. Laying in the weeds, you know. They didn't raise, to the best of my knowledge, they didn't raise this in the – I'm sorry. The other issue, unless you want to continue with that, is the jury instructions. Defense counsel didn't want them defined any further. There is no IPI for solicitation. There is no IPI for a bet. Any experienced trial lawyer doesn't want to prove his client innocent. He wants to keep the state from proving his client guilty. And the more jury confusion, the more delay, the more misunderstanding, the better. Because you're going to get a not guilty or you're going to get a hung jury. A hung jury is almost as good as a not guilty. So when the jury indicates we're confused, we can't even define simple words. Any competent defense lawyer is going to say, no, no more instruction. We don't want any more instruction. And that's what this lawyer did. And I think that goes along with all three of these lawyers were very competent, had a very sound strategy, but it didn't work. Now, I don't know how you can say, my lawyer agreed to it, but it's plain error. What you have to say is, my lawyer did it, and I received an effective assistance of counsel. You can't jump over that logical gap. And I had a case here by Justice Steigman, which apparently didn't bring up the defense. It says you can't do that. What you do in that situation is argue you received an effective assistance of counsel. Not plain error, but they don't do that. They do the opposite. The other issue of whether or not there was sufficient evidence to show that they entered without authority, I went over that several times in my brief. Again, the defendant says, sure, I was there, I had a mask on, and I hit you. So, what's left? How did they get in there? Four guys, 3 o'clock in the morning, one of them wearing a mask, and they want you to believe that Mr. Dickey came down and said, come on in. Come on in when there's no windows there. He had four guys. One of them had been to that party. He was angry. He was looking for revenge. He said he would come back for revenge. He went and stirred his father up. They got a couple other guys. One of them they don't identify. One of them's got a mask, and they forced their way in. Mr. Majors, what about the evidence that the state put in about Carl King? Okay, they didn't raise that. She didn't have time. King is a guy playing cards with debt. Right. And it says it's not a outlawed motorcycle gang. It's the outlawed motorcycle gang. So I assume there's a gang called the Outlaws there. King didn't testify. King didn't have anything to do with this. Right. So why is the state even asking that question? Well, I think it was a mistake by the prosecutor. But I don't think it amounts to structural error, Your Honor. And if I may, I mean, my only contact with the outside world is television. I go from my office to my home and my office to my home. Everybody's on a motorcycle. I mean, every sports icon, every entertainment icon. Yeah, but they're not all motorcyclists. They call themselves outlaws. They have tattoos. Everybody has tattoos. Clubs are out here raising money for abused children. Mr. Majors, let me put it this way. You admit that the state should not have done it. Stupid, stupid thing to do, yes. But I don't think it amounts to structural error or reversal error. You've stood here and said it was a really strong case. So why in the heck is the state messing around like that? Because I assume he's a young and inexperienced prosecutor, judge. And they laid in the woods on that. They laid in the weeds. They didn't say, hey, we object or we want the jury admonished. They wait until it's all over and ask for a mistrial. That may be what saves you. Well, I think these lawyers, again, these trial lawyers are very smart. They knew what they were doing. They were laying in the weeds. They were playing the angles. They did the best they could. But if you come to somebody's house at 3 o'clock in the morning with a mask on and punch somebody in the face, there's not much they can do for you. Any other questions? All right. Thank you, Mr. Majors. Ms. Eisner, rebuttal. First, Your Honors, on the continuance issue, the state and the police can't be divorced from this. It's this police officer. It's a state's witness that can't be divorced. The state's responsible. That cannot be avoided. Can't try to weavel out of his own responsibility, his own lack of candor. We ask, what candor? Where is the candor here? So that point cannot be accepted. As far as wanting confusion on the jury instructions, I find that rather cynical. Counsel wanted a fair verdict. He wanted the jury to be instructed. When he makes a mistake, he makes a mistake. But to say that he was laying in the weeds and wanting confusion is not supported by the record and is, frankly, offensive. For the motorcycle issue, it's not fleeting and it happened on more than one occasion. And it seems to be a pattern here. It happened four times. Because it was part of their theory of the case. Since they didn't have any evidence that my client knew. My client was not connected with Corey. He wasn't at the birthday party. He didn't know any threats. The only way that they could try to take this group of people and make them look awful is to tie them with Corey, to use clothing, to use motorcycle pants, to use biker outlaw insinuations. As much as we'd like to ride motorcycles, that was not part of this case. There's a dispute about the entry. That's correct. There's a dispute about the entry in the sense that Craig and Dickey do not testify exactly to the same kinds of things. Which is why Dickey's credibility is so important that he be impeached by Officer Latt. But if you look at all the evidence... If he's impeached by Officer Latt... Correct. If he's impeached on half of that would be on an issue that Mr. Wissmiller admitted. No. It's not about the phone. No. Because what... Mr. Craig did not make an admission. Craig did not make an admission. His testimony was wholly consistent with the entry being consensual. No, about after the entry with the cell phone. The cell phone... It gets knocked out of his hand. Doesn't everybody agree to that? Everyone agrees that it got knocked out of his hand. But the way Craig testified to it, that the jury could have believed, was that it was incidental to him explaining this emergency. And that Dickey had already... And he was frustrated. And he was frustrated. And Dickey had already agreed to take him to find Jacob and let's get this over with and let's find out what happened because there is a missing person. That is what Craig testified. So if Latz... And the jury could have found not only would Latz's testimony impeach Dickey, but would also corroborate the way Craig said, Mr. Wissmiller said, the phone incident went down. It was minor. It was insignificant. And it had nothing to do... It was not integral to the entry. What time of the morning was it? It was for college kids, for young people. Mr. Wissmiller was not in college. No. They weren't in college. But the residents of the apartment were in college. And the birthday party, the Facebook party, started late. So it was not as if anyone would expect to be inconvenienced or disturbed or... If somebody comes into my house at 3 o'clock in the morning and slaps the cell phone out of my hand when I'm being called, I'm beginning to think this is a pretty unsettling situation. It's not unsettling under the facts of this case. I mean, the purpose was explained to them. They knew about this. And there was an emergency and he let them in. And he didn't want to admit it. He didn't want to admit it. But what he did, whether he admits it or not, and that's why it's not such a contest for the reasonable doubt, is that no matter how you look at what he did, whether he was coming downstairs, whether the door was open, whether the door was not open, it's like, I don't want to... I let him in and now I don't want to... During the 911 call, he tells the operator they just came in. He doesn't say, I let them in. Two things on there. One is that when you read that, which of course is inadmissible for another reason. It's not an excited utterance. It's not. It violates the prior consistent statement ban. But just for the purposes of argument that it's admissible, he doesn't say anything until he's pressed by the dispatcher. It isn't until the very end that you almost get the impression that you don't even know that he was there when he's saying, hmm, what happened here? He says, there's sort of a litany that he says. He says, these guys are here. Yeah, no, they came in. Then to Officer Latz, which the jury didn't get to hear, they knocked me down. He didn't knock me down. We don't know if Latz could have said, I made a mistake in my report, he never said that. No, absolutely not. Absolutely not. And there's absolutely no reason to assume that he would depart from his police report. Okay. Your time. Thank you. Thank you both. Thank you. We'll take this matter under advisement and we'll recess until the next case.